### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

**RODRICK PAYTON,**

       Plaintiff,

    vs.                                 No.    **CIV 03-0315 MCA/ACT**

**CITY OF ALBUQUERQUE,**
a municipal corporation,
**HENRY PEREA**, an individual,
**MICHAEL A. SISNEROS**, an individual,
and **HARRY TIPTON**, an individual,

       Defendants.


### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the ***City Defendants' Motion for Summary Judgment Requesting Dismissal of All of Plaintiff's Claims*** [Doc. No. 31] filed on January 16, 2004.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the Defendants' motion as to Counts 1, 2, and 4 of Plaintiff's *Complaint* for the reasons set forth below.  The Court denies Defendants' motion on jurisdictional grounds with respect to Count 3 of Plaintiff's *Complaint*.  That count arises under state law, and the Court declines to exercise supplemental jurisdiction over such state-law claims.  Accordingly, Counts 1, 2, and 4 of Plaintiff's *Complaint* are dismissed with prejudice, and Count 3 of Plaintiff's *Complaint* is dismissed without prejudice for lack of supplemental jurisdiction.

I.      **BACKGROUND**

On March 12, 2003, Plaintiff Rodrick Payton filed this civil action against Defendants City of Albuquerque, Henry Perea, Michael A. Sisneros, and Harry Tipton.  The first two counts of Plaintiff's *Complaint* allege that these Defendants engaged in racial discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17, by investigating, suspending, and eventually terminating Plaintiff's employment as a corrections officer in the Bernalillo County Detention Center.  The third count of Plaintiff's *Complaint* alleges a state-law claim for breach of contract, and the fourth count asserts a cause of action under 42 U.S.C. § 1983 based on allegations that Defendants retaliated against Plaintiff for engaging in speech protected by the First Amendment to the United States Constitution.  [Doc. No. 1.]

On January 16, 2004, Defendants moved for summary judgment on all of Plaintiff's claims.  [Doc. No. 31.]  The undisputed facts and evidence of record relating to Defendants' summary-judgment motion can be summarized as follows.

Plaintiff began his employment as a corrections officer at the Bernalillo County Detention Center in May 2000.  [Payton Dep. at 10-11.]  During his employment, the Detention Center received and investigated several complaints that he mistreated inmates.  [Defts. Ex. E, F, G, H, X, Z, HH.]  While some of these investigations were pending, Plaintiff's job duties were altered such that he had no contact with inmates.  [Payton Dep. at 186-87.]  In particular, Plaintiff was prohibited from working on Detention Level 4 West

during an investigation commencing on May 3, 2002, and was put in "no inmate contact" status on May 28, 2002.  [Defts. Ex. R, BB.]

Plaintiff also was disciplined during his employment at the Detention Center.  He received a 30-day suspension, closely followed by a 60-day suspension and the termination of his employment in December 2002.  [Defts. Ex. FF-2,[1] SS, TT.]

Defendants Perea and Sisneros were involved in these disciplinary actions arising from Plaintiff's alleged mistreatment of inmates at the Detention Center.  Defendant Perea is the Captain of the Detention Center's Civil Litigation and Internal Affairs Division, and he sent predetermination hearing notices to Plaintiff regarding the disciplinary actions noted above.  [Defts. Ex. PP, QQ.]  Defendant Cisneros is the Deputy Director of the Detention Center, and he made the decision to impose the discipline noted above.  [Defts. Ex. FF-2, SS, TT.]  Defendant Tipton was the Director of the Detention Center and was involved in the final decision to terminate Plaintiff's employment.  [Compl. ¶ 4; Answer ¶ 4..]

Complaints against Plaintiff by three particular inmates, and the Detention Center's investigations of those complaints, are summarized below.  According to Defendants, Plaintiff's employment was terminated based on the results of the investigation of these three particular incidents.

---

[1]The exhibits submitted by Defendants in support of their summary-judgment motion contain two exhibits identified as "FF."  The second exhibit "FF" (Defendant Sisneros inter-office correspondence to Plaintiff dated December 19, 2002), which appears in between Defendants' Exhibits QQ and SS,  is identified in this *Memorandum Opinion and Order* as Defendant's Exhibit FF-2.

### 1.   The Incident Involving Inmate James Fabrizio

On the night of May 2, 2002, Plaintiff was involved in an altercation with inmate James Fabrizio while on duty in Detention Level 4 West.  The following day, Mr. Fabrizio complained to Sergeants Juan Chacon and Fred Bailey that Plaintiff had thrown him to the ground and kicked him during this altercation.  Sergeants Chacon and Bailey reported Mr. Fabrizio's complaint to Captain Michael Archuleta.  [Defts. Ex. O, R.]  Sergeant Chacon also collected witness statements regarding the altercation.  [Defts. Ex. O, P, Q-1 to Q-6.]

In a letter from Sergeant Chacon dated May 4, 2002, Plaintiff was notified of the investigation of Mr. Fabrizio's complaint and instructed to provide a report explaining the incident.  [Defts. Ex. X.]  In a written report addressed to Lieutenant Doug Robinson, Plaintiff claimed that Mr. Fabrizio spit blood in his face and that he "used the amount of force reasonably necessary to restrain and control the inmate without further injury to myself or the inmate with help from detail officer Robert Sena."  [Defts. Ex. S.]  Plaintiff wrote a similar account in a logbook dated May 2, 2002.  [Defts. Ex. U.]  Officer Sena denied witnessing or assisting in any kind of restraint on Mr. Fabrizio.  [Defts. Ex. T.]  Plaintiff later produced an unsworn statement by Juan J. Coello-Pagan claiming that, on May 3, 2002, he heard Mr. Fabrizio say that he was going to make sure Plaintiff got fired.  [Pl. Ex. E.[2]]

---

[2]Contrary to the Court's trial preparation instructions attached to the *Initial Pretrial Report* [Doc. No. 15], Plaintiff's counsel has identified his exhibits by using letters rather than numbers, thereby creating two sets of exhibits identified by the letters "A" through "G."  To avoid confusion, this *Memorandum Opinion and Order* refers to Plaintiff's exhibits as "Pl. Ex." and Defendant's exhibits as "Defts. Ex."

Captain Archuleta provided the results of the Detention Center's internal investigation of the incident to Major Larry L. Cook in a report dated May 10, 2002. [Defts. Ex. W.] The matter was subsequently assigned to an external investigator, who provided a report dated October 8, 2002. [Defts. Ex. W, LL, MM.] Plaintiff was then formally charged with violating several of the Detention Center's policies and procedures relating to his use of force against Mr. Fabrizio and his truthfulness during the investigation of the incident.

In a Pre-Determination Hearing Notice dated October 29, 2002, Defendant Perea notified Plaintiff of these charges. [Defts. Ex. PP] Following a hearing on November 5, 2002, Defendant Sisneros issued a 30-day suspension for violating the Detention Center's policies and procedures. Plaintiff was notified of this disciplinary action on December 4, 2002. [Defts. Ex. SS.]

### 2.    The Incident Involving Inmate Alexander Anderson

On May 3, 2002, Plaintiff performed a search of inmate Alexander Anderson's person while on duty in the booking area of the Detention Center. In a written grievance dated May 6, 2002, Mr. Anderson complained that Plaintiff had used excessive force during the search by grabbing his testicles and lifting him off the ground three times. Mr. Anderson's grievance was received by Lieutenant Robert Candelaria on May 22, 2002. [Defts. Ex. Y.]

In a letter from Captain Archuleta dated May 22, 2002, Plaintiff was notified of Mr. Anderson's grievance and instructed to provide a written response. [Defts. Ex. Z.] In a written statement dated May 22, 2002, Plaintiff denied placing his hand on Mr. Anderson's

testicles and claimed that he lifted Mr. Anderson off the ground because Mr. Anderson turned his body and resisted the search by kicking at Plaintiff.  [Defts. Ex. AA.]

Plaintiff's search of Mr. Anderson was videotaped, and the videotape was preserved as evidence.  [Defts. Ex. DD.]  After reviewing the videotape, Lieutenant Candelaria wrote a report to Captain Archuleta dated May 25, 2002, in which he concluded that Mr. Anderson's grievance was valid and that Plaintiff was not being completely truthful about the incident.  [Defts. Ex.CC.]  The videotape and witness statements regarding the incident also were reviewed by Captain John E. Van Sickler, who reached similar conclusions in a report to Major Cook dated May 28, 2002.  [Defts. Ex. EE.]

The matter was referred to an external investigator, who issued a report dated July 28, 2002, concluding that Plaintiff's use of force against Mr. Anderson was unjustified and that Plaintiff's statements about the incident were untruthful.  [Defts. Ex. LL, NN.]  Plaintiff was later formally charged with violating several of the Detention Center's policies and procedures relating to the use of force and his truthfulness during the investigation of the incident.

In a Pre-Determination Hearing Notice dated October 29, 2002, Defendant Perea notified Plaintiff of these charges.  [Defts. Ex. QQ.]  Following a hearing on November 6, 2002, Defendant Sisneros issued a 60-day suspension for violating the Detention Center's policies and procedures.  Plaintiff was notified of this disciplinary action on December 9, 2002.  [Defts. Ex. TT.]

### 3.   <u>The Incident Involving Inmate Robert Martinez</u>

On May 3, 2002, Plaintiff came into contact with inmate Robert Martinez while on duty in the booking area of the Detention Center.  The Detention Center later received a Tort Claim Notice from Mr. Martinez's attorney dated June 25, 2002.  The Tort Claim Notice asserted that Plaintiff verbally abused Mr. Martinez after he requested medical attention for a gunshot wound on his left arm, and that Plaintiff subsequently grabbed his wounded arm and twisted it behind his back.  [Defts. Ex. GG.]

In a letter from Defendant Perea dated July 1, 2002, Plaintiff was notified of the investigation of Mr. Martinez's complaint and directed to provide a written response. [Defts. Ex. HH.]  In an undated written statement addressed to Defendant Perea, Plaintiff claimed that he did not recall having any contact with Mr. Martinez.  [Defts. Ex. II.]  After reviewing a videotape of the incident [Defts. Ex. DD], however, Plaintiff prepared another statement addressed to Defendant Perea.  In the latter statement, Plaintiff claims that he made Mr. Martinez turn around after Mr. Martinez refused a direct order to do so, and that he "assisted Mr. Martinez to a standing position" after Mr. Martinez "took one knee to the ground." [Defts. Ex. JJ.]

In a report to Major Cook completed on August 6, 2002, Captain Van Sickler concluded that Plaintiff had used excessive force against Mr. Martinez and that Mr. Martinez had done nothing to provoke Plaintiff's actions.  [Defts. Ex. KK.]  The matter was referred to an external investigator [Defts. Ex. LL], who issued a report dated October 16, 2002,

concluding that Plaintiff used excessive and unwarranted force against Mr. Martinez. [Defts. Ex. OO.]

Following a pre-determination hearing regarding this incident on November 6, 2002, Defendant Sisneros issued a letter dated December 19, 2002, terminating Plaintiff's employment with the Detention Center. [Defts. Ex. FF-2.] Defendant Sisneros took into account the prior incidents involving Mr. Fabrizio and Mr. Anderson, as well as the incident involving Mr. Martinez, in making the decision to terminate Plaintiff's employment. [Defts. Ex. UU.]

### 4.    **Plaintiff's EEOC Charges**

Plaintiff asserts that the three incidents summarized above do not account for the real reasons why he was placed under investigation and subjected to disciplinary action by Defendants. According to Plaintiff, he suffered adverse employment action because of a racial animus against African Americans and/or a retaliatory motive.

In his deposition testimony, Plaintiff claims that he confronted other Detention Center employees about behavior or treatment that he regarded as exhibiting a racial animus against African Americans. This behavior or treatment included the use of racial slurs or other language that had a racially derogatory connotation. Plaintiff also complained about the assignment of corrections officers to the Detention Center's booking area because he believed that these assignments suspiciously omitted African American officers from the roster for that duty. In addition to confronting instances of racial discrimination against African Americans that he perceived at the Detention Center, Plaintiff claims to have

reported other forms of illegal or inappropriate activity by other corrections officers, such as bringing illegal drugs to inmates or providing certain inmates with preferential treatment. [Payton Dep. at 40-41, 54-57, 66-67, 92-93, 98-101, 107, 137-39, 141, 157, 160-61, 163, 166-76, 186-87, 203, 236, 243-44, 261-62, 264.]

Plaintiff's allegation that he was personally subjected to racial discrimination at the Detention Center was first brought to the attention of the Equal Employment Opportunity Commission (EEOC) in a Charge of Discrimination dated May 15, 2002, wherein Plaintiff asserted that he was harassed and unfairly disciplined because of his race.  [Defts. Ex. B.] Inter-office correspondence between the City of Albuquerque's EEOC office and the Detention Center indicates that the director of the Detention Center received notice of Plaintiff's EEOC complaint by May 23, 2002 [Defts. Ex. FF], while the inmate complaints against Plaintiff by Messrs. Fabrizio and Anderson were under investigation by Captain Archuleta and Major Cook.  [Defts. Ex. W, Z.]

Plaintiff filed a second charge of discrimination with the EEOC on June 14, 2002. Plaintiff's second EEOC charge alleges that he was subjected to retaliation because of his previous EEOC charge, and that this retaliation took the form of harassment and intimidation by his supervisors.  [Defts. Ex. C.]  The investigations of the inmate complaints against Plaintiff by Messrs. Fabrizio and Anderson were still pending at the time of Plaintiff's second EEOC charge, and Plaintiff had been placed in "no inmate contact" status before the filing of that second charge.  [Defts. Ex. W, BB, CC, EE.]

Plaintiff filed a third charge of discrimination with the EEOC on January 3, 2003, alleging that he subjected to further retaliation because of his previous EEOC charges. [Deft. Defts. Ex. D.] Plaintiff's third EEOC charge was filed after he was subjected to disciplinary action and his employment with the Detention Center was terminated. [Defts. Ex. FF-2, SS, TT.] Plaintiff alleged in this third charge that his 30-day suspension and the termination of his employment were retaliatory. [Defts. Ex. D.]

### 5. Other Evidence Produced in Discovery

In the course of discovery, Defendants produced a list of corrections officers (other than Plaintiff) who were charged with using excessive force during the period between 1999 and 2002. This list contains twenty items, one of which involved the termination of a corrections officer's employment, and ten of which involved suspensions ranging from one to ninety days. [Pl. Ex. G.]

In response to Defendants' summary-judgment motion, Plaintiff produced the excerpts from the deposition testimony of two other corrections officers. These officers testified that Plaintiff came to work on time and that he acted professionally and did not engage in misconduct in their presence. [Hogan Dep. at 34-36; Butler Dep. at 73-74.] There is no evidence, however, that they were in Plaintiff's presence at the time of the incidents relating to Messrs. Fabrizio, Anderson, or Martinez. [Hogan Dep. at 36, 54-60; Butler Dep. at 22-23.]

Plaintiff also produced a "Law Enforcement Expert Report" dated August 18, 2003. This report opines that Plaintiff's use of force against Messrs. Fabrizio, Anderson, and

Martinez was not excessive.  [Pl. Ex. D.]  There is no evidence, however, that the author of this report was involved in the investigation of these incidents prior to the termination of Plaintiff's employment, or that Defendants had notice of his report prior to August 18, 2003. In addition, Plaintiff did not attach any materials by which to assess the author's qualifications as an expert.

## II.    ANALYSIS

### A.    Standard of Review

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim.  See id. at 248.  Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex Corp., 477 U.S.

at 324; Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998). "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)). Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).

In this case, the parties have submitted exhibits and deposition testimony that contain hearsay and hearsay within hearsay. In reviewing these materials to determine whether Defendants are entitled to summary judgment, the Court does not consider statements that affiants or deponents attribute to others for the purpose of proving the truth of the matters asserted therein, except for admissions by a party opponent (or agent thereof) which the affiant or deponent witnessed. See Fed. R. Evid. 801(d)(2); Wright-Simmons, 155 F.3d at 1268; Pastran v. K-Mart Corp., 210 F.3d 1201, 1203 n.1 (10th Cir. 2000). The Court does, however, consider statements attributed to third parties for other admissible purposes. In particular, such statements may be considered for the limited purpose of showing their effect on the listener or the declarant's state of mind. See Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) (effect on the listener); Wright v. Southland Corp., 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (declarant's state of mind); Pastran, 210 F.3d at 1203

-12-

n.1 (similar).  They also may be considered as verbal acts or operative facts when legal consequences flow from the utterance of the statements.  <u>See generally</u> <u>Echo Acceptance Corp. v. Household Retail Servs., Inc.</u>, 267 F.3d 1068, 1087 (10th Cir. 2001).

Apart from these limitations imposed by the Federal Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 551-52 (1999).

### B.    <u>Plaintiff's Title VII Claims</u>

As an initial matter, the Court notes that Defendants Perea, Sisneros, and Tipton are not proper defendants with respect to Plaintiff's Title VII claims because Title VII does not impose liability on individual employees.  <u>See</u> <u>Haynes v. Williams</u>, 88 F.3d 898, 901 (10th Cir. 1996); <u>cf.</u> <u>Butler v. City of Prairie Village</u>, 172 F.3d 736, 744 (10th Cir. 1999) (collecting cases).  Accordingly, Defendants Perea, Sisneros, and Tipton are entitled to summary judgment on all of Plaintiff's Title VII claims, and the Court limits its analysis of these claims to Defendant City of Albuquerque.[3]

---

[3]To the extent that the law permits Plaintiff to bring Title VII claims against Defendants Tipton, Sisneros, and Perea individually, they are entitled to summary judgment on those claims for the same reasons articulated with respect to Defendant City of Albuquerque.

Counts 1 and 2 of Plaintiff's *Complaint* allege that Defendants violated Title VII of the Civil Rights Act by engaging in racial discrimination and retaliation. Title VII of the Civil Rights Act "makes it an 'unlawful employment practice for an employer . . . to discriminate against any individual . . . , *because of* such individual's race, color, religion, sex, or national origin.'" Desert Palace, Inc. v. Costa, 539 U.S. 90, 92 (2003) (quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis added). Title VII also makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed . . . an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

There are two forms of racial discrimination or retaliation that are actionable under Title VII: disparate treatment and the creation of a hostile work environment. See generally Trujillo v. Univ. of Colo. Health Sciences Ctr., 157 F.3d 1211 (10th Cir. 1998) (reviewing hostile work environment, disparate treatment, and retaliation claims); Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1264-65 (10th Cir. 1998) (reviewing a claim for a retaliatory hostile work environment). In response to Defendants' summary-judgment motion in this case, Plaintiff presents no authority or argument in support of a hostile work environment claim. Cf. Adler, 144 F.3d at 672 ("[T]he requirement that the nonmovant specifically reference facts in its motion materials and the record is of special importance in an employment discrimination case."); Pelfresne v. Village of Williams Bay, 917 F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent

-14-

authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point.").

To the extent that Plaintiff's *Complaint* or his charges of discrimination before the EEOC are to be construed as raising a hostile work environment claim under Title VII, Defendants are entitled to summary judgment on that claim.  Not every instance of bothersome or inappropriate behavior with a racial or retaliatory connotation is deemed to create a hostile work environment that violates Title VII.  The standards developed by the Supreme Court for determining whether such an environment exists are not intended to become a "'general civility code'" encompassing normal job stress and ordinary tribulations of the workplace, such as the sporadic use of abusive language and occasional teasing, Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), or "a few isolated incidents of racial enmity," Trujillo, 157 F.3d at 1214; accord Bolden v.PRC Inc., 43 F.3d 545, 551 (10th Cir.1994).

The admissible evidence of record cited by the parties in this case does not show conduct that is objectively severe or pervasive enough to constitute racial discrimination or retaliation in the form of a hostile work environment under the standard set forth above.  In particular, Title VII does not give an employee immunity from being reprimanded in the presence of his co-workers if his supervisor believes that he has violated work rules or has been negligent in performing his job.  See Gross, 53 F.3d at 1545-46.  Further, a plaintiff cannot survive a summary-judgment motion simply by alleging that her supervisor's decisions in this regard were wrong or mistaken.  See Pamintuan v. Nanticoke Mem. Hosp.,

192 F.3d 378, 387 (3d Cir. 1999). The loss of prestige or authority that Plaintiff may have felt as a result of the supervision, investigation, or work assignments that he received from his employer falls into the category of "monitoring and job stress typical of life in the real world" and is not actionable under Title VII as a hostile work environment. Trujillo, 157 F.3d at 1214.

The Court next addresses Plaintiff's claims of disparate treatment. In analyzing such claims, the Court focuses on the dates of discrimination reported in the charges that Plaintiff filed with the EEOC, which runs from May 2, 2002, until the termination of his employment on December 19, 2002. [Defts. Ex. B, C, D.] In this regard, the Court's analysis is bound by the Tenth Circuit's ruling in Martinez v. Potter, 347 F.3d 1208, 1210-1211 (10th Cir. 2003), which rejects application of the "continuing violation" theory in this context. Nevertheless, prior acts for which Plaintiff has not exhausted his administrative remedies may still be considered as "'background evidence'" insofar as they are relevant to the charges that were properly exhausted. Id. at 1211 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)).

Plaintiff may prove his disparate-treatment claims by direct evidence or circumstantial evidence. See Desert Palace, Inc., 539 U.S. at 99-100; Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000). To the extent that he relies on circumstantial evidence, the Court applies the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

In order to establish a prima facie case of retaliation in the form of disparate treatment under this framework, Plaintiff generally must show (1) that he "engaged in protected activity; (2) that the employer took an adverse employment action against the plaintiff; and (3) that there exists a causal connection between the protected activity and the adverse action." Aquilino v. Univ. of Kansas, 268 F.3d 930, 933 (10th Cir. 2001). In order to establish a prima facie case of racial discrimination in the form of disparate treatment under this framework, Plaintiff generally must show "(1) that he is a member of a racial minority, (2) that he suffered an adverse employment action, and (3) that similarly situated employees were treated differently." Trujillo, 157 F.3d at 1215.

In determining whether these general requirements are satisfied, the Court recognizes that the elements of a *prima facie* case are to be measured by "a flexible standard that may be modified to accommodate different factual situations." Perry v. Woodward, 199 F.3d 1126, 1140 n.10 (10th Cir. 1999) (citing Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 (1977)). Thus, when the "adverse employment action" challenged by an employee is the termination of his employment, one way that the employee may establish a *prima facie* case of discrimination is by "show[ing] that: '(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge.'" English v. Colo. Dep't of Corr., 248 F.3d 1002, 1008 (10th Cir. 2001) (quoting; Kendrick, 220 F.3d at 1228). It is not necessary to show that the employee hired to replace Plaintiff falls outside the protected class, see Kendrick, 220 F.3d at 1229, and the fact that the job was not eliminated after Plaintiff's discharge may

be inferred from the employer's stated reasons for the discharge, *i.e.*, that Plaintiff violated the Detention Center's policies and procedures regarding the use of force and truthfulness during investigations, see English, 248 F.3d at 1008.

In this case it is undisputed that, as an African-American, Plaintiff is a member of a racial minority.  It is also undisputed that he engaged in protected activity by filing charges with the EEOC.  Further analysis is required, however, to define which discrete acts by his employer constitute "adverse employment actions."

While the Tenth Circuit liberally defines the term "adverse employment action" in disparate-treatment cases to encompass more than just "monetary losses in the form of wages or benefits," this definition does not include "'a mere inconvenience or an alteration in [Plaintiff's] job responsibilities.'"  Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998) (quoting  Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir.1993)).  This definition also does not include actions which "had, at best, a de minimis effect on [the employee's] future employment opportunities."  Aquilino, 268 F.3d at 934.  "Speculative harm does not constitute adverse employment action."  Id. at 936.

It follows that changes in work assignments, criticism by a supervisor, or other negative comments about an employee that do not cause any present or foreseeable future economic injury are not adverse employment actions, regardless of the fact that they may result in feelings of diminished prestige.  See Davis v. Town of Lake Park, 245 F.3d 1232, 1240-45 (11th Cir. 2001); accord Primes v. Reno, 190 F.3d 765, 767  (6th Cir. 1999).  Investigations prompted by allegations of employee misconduct also do not constitute

-18-

adverse employment actions when they are performed in a routine manner following the regular and legitimate practices of the employer.  See Stockett v. Muncie Indiana Transit Sys., 221 F.3d 997, 1001-02 (7th Cir. 2000) (discussing a requirement that an employee submit to a drug test).

On the other hand, there is no question that the suspension or termination of Plaintiff's employment constitutes an "adverse employment action" under the authorities cited above.  To the extent that events which preceded these actions (such as the initial investigation of inmate complaints against Plaintiff) are relevant to determining the reasons or motives for his subsequent suspension and termination, they also may be considered in the Court's analysis.  See Martinez, 347 F.3d at 1211.

Applying the flexible standard articulated by the Tenth Circuit in English, 248 F.3d at 1008, the Court concludes that Plaintiff has established a *prima facie* case of racial discrimination or retaliation under the McDonnell Douglas framework with respect to his two suspensions and the termination of his employment in December 2002.[4]  Accordingly, the burden of production shifts to his former employer to articulate a facially legitimate, nondiscriminatory and nonretaliatory reason for these employment actions.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-49 (2000); Kendrick, 220 F.3d at 1226.

---

[4]The Court's conclusion that Plaintiff has established a *prima facie* case does not imply that he has satisfied his burden of showing that Defendants' stated reasons for his suspension or termination are pretextual.  The evidence supporting Plaintiff's *prima facie* case, and the reasonable inferences therefrom, are not sufficient in themselves to cast doubt on Defendants' stated reasons for imposing these disciplinary actions in this case.  See English, 248 F.3d at 1009.

Defendants have presented evidence that they suspended Plaintiff and then terminated his employment because Plaintiff violated the Detention Center's policies and procedures by using excessive force against three inmates and being untruthful during the investigation of these inmates' complaints against him. The Court determines that this evidence satisfies Defendants' burden of producing facially legitimate, nondiscriminatory and nonretaliatory reasons for the disciplinary measures at issue in this case. A law enforcement or corrections officer's use of excessive force or other inappropriate contact with a detainee is recognized as a facially non-discriminatory reason for terminating that officer's employment. See Murray, 45 F.3d at 1422 (use of excessive force); English, 248 F.3d at 1009 (sexual relations with inmate). On a more general level, violence or threats of violence in the workplace are recognized as facially nondiscriminatory reasons for terminating employment. See Burns v. Bd. of County Comm'rs, 330 F.3d 1275, 1283 (10th Cir. 2003); Kendrick, 220 F.3d at 1230.

Because Defendants have met their burden of production, summary judgment is warranted unless Plaintiff can show that there is a genuine issue of material fact as to whether the reasons proferred by the employer are pretextual or whether his race or other illegal consideration (such as retaliation for filing an EEOC complaint) was a motivating factor in the employment decision. See Reeves, 530 U.S. at 147-49; Kendrick, 220 F.3d at 1226. A plaintiff in a Title VII case can show pretext by presenting evidence that the reasons proferred by the employer are so weak, implausible, inconsistent, incoherent, or

contradictory as to support a reasonable inference that the employer did not act for those reasons.  See Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).

In particular, such pretext may be shown by evidence concerning the "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria."  Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir. 1999).  Pretext also may be shown:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

Kendrick, 220 F.3d at 1230 (citations omitted).  Further, statements by a decision-maker that evince a discriminatory or retaliatory motive for an employment action also may be used to show pretext under the McDonnell Douglas framework so long as there is some nexus between the statements and the employment action taken against the employee.  See English, 248 F.3d at 1010; Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1209-10 (10th Cir. 1999); McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998).

On the other hand, the temporal proximity between an employee's protected activity (such as filing a charge with the EEOC) and an adverse employment action "is not sufficient by itself to raise an issue of fact" regarding pretext.  Pastran, 210 F.3d at 1206.  Further,

"[a]n articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment."  McKnight, 149 F.3d at 1129.

Plaintiff presents three basic theories in support of a finding of pretext or mixed motive in this case.  First, he contends that the force he used against Messrs. Fabrizio, Anderson, and Martinez was not excessive, and that Defendants' findings to the contrary are erroneous.  Second, Plaintiff asserts that even if he violated the Detention Center's policies and procedures with respect to these individuals, the level of discipline imposed for such violations evinces a racial or retaliatory motive because non-African-American personnel who committed similar violations did not lose their jobs.  Finally, Plaintiff asserts that retaliation or racial bias against African Americans was a motivating factor with respect to the disciplinary actions in this case because other Detention Center employees used racial slurs, made other remarks that had a racially derogatory connotation, or generally expressed displeasure with his allegations about racial discrimination or other illegal conduct at the Detention Center.

The Court concludes that the evidence of record does not establish a genuine issue of material fact, under any of the above theories, as to whether the reasons preferred by Defendants are pretextual or whether Plaintiff's race or other illegal consideration (such as retaliation for filing an EEOC complaint) was a motivating factor in the employment decisions in question here.  Evidence that other Detention Center personnel were simply wrong or mistaken in concluding that Plaintiff used excessive force is not sufficient to show

that Defendants' reasons are pretextual because "the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994). "'[T]he pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine or pretextual.'" Pastran, 210 F.3d at 1206 (quoting Hardy v. S.F. Phosphates L.C., 185 F.3d 1076, 1080 (10th Cir. 1999). "The test is good faith belief." McKnight, 149 F.3d at 1129. Accordingly, "[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance." Shorter, 188 F.3d at 1209.

For these reasons, Plaintiff cannot simply rely on his own evaluation of how he handled the incidents involving Messrs. Fabrizio, Anderson, and Martinez to establish a genuine issue of material fact as to whether Defendants' response to these incidents was pretextual.[5] Further, the possibility that other Detention Center employees were mistaken in believing the inmates' version of these incidents (as corroborated by the videotapes or witness statements) is not, in itself, sufficient to show pretext. If Defendants took disciplinary action against Plaintiff based on their belief that he used excessive force and was

---

[5]For the same reasons, the "Law Enforcement Expert Report" [Pl. Ex. D] submitted by Plaintiff does not establish a genuine issue of material fact as to the presence of racial or retaliatory motives for the disciplinary actions imposed here. Cf. McKnight, 149 F.3d at 1128-29 (concluding that immaterial omissions or inconsistencies in the investigation of an employee's alleged misconduct did not give rise to a reasonable inference of pretext). In addition, the Court questions the relevance and reliability of an expert opinion offered to prove the reasonableness of an officer's use of force, particularly when that opinion was never offered or considered during the employer's investigation of the incidents in question. See generally Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001).

untruthful with regard to these incidents, "such belief would not be pretextual even if the belief was later found to be erroneous." McKnight, 149 F.3d at 1129.

The Court also concludes that Plaintiff has failed to present admissible evidence that he was treated differently than other, non-African-American corrections officers who were found to have used excessive force and been untruthful during similar investigations. The only evidence that Plaintiff cites in support of this theory is Defendants' response to a discovery request, which provides a list of all corrections officers (other than Plaintiff) who were disciplined for use of excessive force from 1999 through 2002, including the charges made, discipline imposed, and who imposed the discipline. [Pl. Resp. ¶ 70, at 12 (citing Pl. Ex. G).] The list includes one charge that resulted in termination, and ten charges that resulted in suspensions ranging from one to ninety days. The list does not identify the employees according to their race or whether they filed charges with the EEOC. [Pl. Ex. G.] Thus, the list does not establish that Plaintiff was treated differently than other similarly situated employees who are not African American. See Aramburu v. Boeing Co., 112 F.3d 1398, 1404-06 (10th Cir. 1997).

Having failed to show that Defendants imposed less severe discipline on employees who were not African American, Plaintiff falls back on the argument that race or retaliation must have been a motivating factor with respect to the disciplinary actions against him because of certain statements or motives that he attributes to other Detention Center employees and supervisors. In support of this argument, Plaintiff points to his own deposition testimony concerning remarks reflecting a racial animus against African

Americans that he heard from, or attributed to, supervisory personnel at the Detention

Center.[6]  In particular, Plaintiff asserts that he once heard Captain Archuleta refer to African-

Americans as "you people," which Plaintiff understood to have a derogatory connotation.

[Payton Dep. at 54-57.]  Plaintiff further asserts that Major Cook (who is also African-

American) once told him that he was "making problems" for other African-American

employees in the Detention Center [Payton Dep. at 90-93], and that while in the cafeteria he

overheard Defendant Perea refer to him by a racially offensive Spanish term.  [Payton Dep.

at 100-101].

According to Plaintiff, he also made numerous reports to supervisory personnel,

including Major Cook, Captain Van Sickler, and Captain Archuleta, about the way African-

Americans were treated at the Detention Center.[7]  [Payton Dep. at 39-41, 54-57, 90-93, 106-

08, 137-41, 243-44.]  Plaintiffs' reports to supervisory personnel allegedly included

accusations that other employees at the Detention Center (including Lieutenant Candelaria)

---

[6]The Court considers the statements of other Detention Center personnel that Plaintiff
personally heard insofar as they constitute vicarious admissions by a party opponent concerning
matters within the scope of their employment and were made during the course of their agency or
employment relationship with Defendant City of Albuquerque.  See Fed. R. Evid. 801(d)(2)(D);
Pastran, 210 F.3d at 1203 n.1.  To the extent that these statements are hearsay (rather than
admissions by a party opponent), the Court considers them insofar as they are introduced for the
purpose of showing the declarant's then existing state of mind.  See Wright, 187 F.3d at 1304 n.21;
Pastran, 210 F.3d at 1203 n.1.

[7]The Court considers Plaintiff's testimony about what he reported to other Detention Center
employees insofar as such reports are relevant to show their effect on the listeners.  See generally
Faulkner, 3 F.3d at 1434.

were engaged in illegal activity, such as providing contraband to inmates or granting special privileges to certain inmates.  [Payton Dep. at 166-76.]

The Court concludes that this evidence does not support a reasonable inference that Defendants' reasons for the disciplinary actions in question are pretextual or that racial discrimination or retaliation were motivating factors in these actions.  Although comments evincing an improper bias or prejudice may provide circumstantial evidence of a discriminatory hiring decision, see Shorter, 188 F.3d at 1209-10, the Tenth Circuit has emphasized that the statements in question must be "made by the decision maker," and that "there must be a nexus between the discriminatory statements and the [hiring] decision," McKnight, 149 F.3d at 1128; accord Burns, 330 F.3d at 1284; English, 248 F.3d at 1010. Without such a nexus to the decision-making process, retaliatory or racially derogatory statements by other employees must be treated as "stray remarks" rather than evidence of discrimination or retaliation.  See McKnight, 149 F.3d at 1129.

In this case, it is undisputed that all three of the incidents which form Defendants' stated reasons for suspending Plaintiff and terminating his employment predate the filing of Plaintiff's first EEOC charge.  It is also undisputed that the termination of Plaintiff's employment was imposed by Defendants Sisneros and Tipton, and that the two suspensions which preceded the termination were imposed by Defendant Sisneros.  [Defts. Mem. ¶¶ 55, 56, 57, at 10; Pl. Resp. ¶¶ 55, 56, 57, at 9-10; Defts. Ex. FF-2, SS, TT; Compl. ¶ 4; Answer ¶ 4.]  Plaintiff has not presented any admissible evidence of statements by Defendants Sisneros or Tipton to the effect that Plaintiff was or would be disciplined *because* he was

African American or Black, or that Plaintiff was or would be disciplined *because* he filed an EEOC charge or engaged in other activities protected by Title VII.  There is also no admissible evidence in the record that Defendants Sisneros or Tipton tacitly approved or participated in conversations with other Detention Center personnel at which retaliatory or racially derogatory statements were made, or that these statements were connected in some way to the investigations or predetermination proceedings that led to Plaintiff's suspensions or the termination of his employment.

Plaintiff also has failed to establish pretext under a "cat's paw" theory, in which an employer may be held liable for a subordinate employee's racially biased recommendation to discharge another employee if the decision-maker blindly follows that recommendation without independent investigation.  See English, 248 F.3d at 1011.  Even if the statements or motives Plaintiff attributes to subordinate employees in the chain of command (such as Lieutenant Candelaria, Captain Archuleta, or Defendant Perea) arguably have some nexus to an adverse employment action against Plaintiff because those individuals were involved in investigating or processing the inmate complaints by Messrs. Fabrizio, Anderson, and Martinez, Plaintiff has not shown that the outcome of those inmate complaints would have changed had they not been involved.  See Burns, 330 F.3d at 1284-85.

In this regard, the Court notes that the inmate complaints which ultimately led to the termination of Plaintiff's employment were not initiated by the Detention Center personnel whose motives Plaintiff questions, and those personnel were neither key eyewitnesses with regard to the inmates' complaints nor final decisionmakers with regard to the findings made

or the discipline imposed as a result of those complaints.  Further, the incidents which gave

rise to the inmates' complaints occurred in the presence of several other witnesses, and two

of the incidents were captured and preserved on videotape.  [Ex. Q-1, Q-2, Q-3, Q-4, Q-5,

Q-6, DD.]  In addition, Plaintiff was provided the opportunity to respond to each inmate

complaint, and each of the complaints was referred to an outside investigator before any

formal disciplinary charges were brought against Plaintiff.  [Ex. MM, NN, OO.]  Thus, the

evidence does not support a reasonable inference that Defendants Tipton or Sisneros blindly

accepted the findings of a biased subordinate employee without independent investigation,

objectively verifiable information from other sources, or input from Plaintiff.  See English,

248 F.3d at 1011.

Under these circumstances, there is no way to reasonably discern a nexus between the

specific remarks or motives that Plaintiff attributes to other Detention Center personnel and

the decisions of Defendants Sisneros or Tipton to impose discipline.  The evidence of record

in this case does not show that the reasons preferred by Defendants are so weak, implausible,

inconsistent, incoherent, or contradictory as to support a reasonable inference that they did

not act for those reasons.  Rather, the evidence gathered during the investigation of the

inmate complaints by Messrs. Fabrizio, Anderson, and Martinez provided objective,

verifiable grounds for imposing discipline that could be, and were, reviewed by an outside

investigator during the investigation process.  Both the investigations and the disciplinary

actions that followed were conducted in accordance with established policies and reveal no

disturbing irregularities.  See Tran v. Trustees, 355 F.3d 1263, 1270 (10th Cir. 2004).

Finally, the Court considers Plaintiff's alternative argument that he can dispense with the McDonnell Douglas burden-shifting framework based on his assertion that there is direct evidence of racial discrimination or retaliation in this case.  The Tenth Circuit has held that "[s]tatements showing 'an existing policy which itself constitutes discrimination' are direct evidence of discrimination."  Heim v. State of Utah, 8 F.3d 1541, 1546 (10th Cir.  1993) (quoting Ramsey v. City & County of Denver, 907 F.2d 1004, 1008 (1990)).  In addition, "oral or written statements on the part of a defendant showing a discriminatory motivation" are "direct evidence of discrimination," Kendrick, 220 F.3d at 1225, provided that they "'actually relate to the question of discrimination in the particular employment decision, not to the mere existence of other, potentially unrelated, forms of discrimination in the workplace.'"  Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 550 (10th Cir. 1999) (quoting Thomas v. Nat'l Football League Players Ass'n, 131 F.3d 198, 204 (D.C. Cir. 1997)).  On the other hand, mere "statements of personal opinion" that reflect a bias or prejudice which is not tied to the particular employment action at issue are not sufficient to directly prove a discriminatory motive because "the trier of fact would have to infer that the bias reflected in the statements was the reason behind the adverse employment action."  Shorter, 188 F.3d at 1207; see also Perry, 199 F.3d at 1134 (explaining nexus required for direct evidence).

The Court concludes that the racially derogatory or retaliatory statements identified in Plaintiff's deposition testimony do not constitute direct evidence of a discriminatory or retaliatory motive for the disciplinary actions at issue in this case.  As noted above, the evidence of record in this case does not include any statements by, or attributed to,

Defendants Sisneros or Tipton to the effect that they suspended Plaintiff or terminated his employment *because* he is African American or *because* he engaged in activities protected by Title VII (such as filing a charge with the EEOC). To reach the conclusion that racial discrimination or retaliation were motivating factors in the decision to take these disciplinary actions against Plaintiff, the factfinder at trial would have to infer that Defendants Tipton or Sisneros shared, or were influenced by, the racially derogatory or retaliatory sentiments allegedly expressed by other Detention Center employees, and that these sentiments affected their ability to objectively evaluate the accuracy and significance of the inmate complaints or disciplinary charges presented to them. Thus, the statements in question do not constitute "direct evidence" of discrimination or retaliation. See Shorter, 188 F.3d at 1207; Perry, 199 F.3d at 1134; Medlock, 164 F.3d at 550.

For these reasons, the Court concludes that regardless of whether the evidence in this case is considered direct or circumstantial, Plaintiff has failed to meet his burden of showing a genuine issue of material fact with regard to his claims of racial discrimination and retaliation under Title VII. Thus, Defendant is entitled to summary judgment on the Title VII claims asserted in Counts 1 and 2 of Plaintiff's *Complaint*, and these claims must be dismissed with prejudice.

## C. **Plaintiff's First Amendment Retaliation Claim**

Count 4 of Plaintiff's *Complaint* asserts a cause of action under 42 U.S.C. § 1983. This statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Persons sued in their individual capacity under this civil-rights statute generally are entitled to qualified immunity unless it is shown that their actions violated a specific federal statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue. See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).

Because 42 U.S.C. § 1983 is not an independent source of substantive rights, but rather a mechanism for enforcing federal rights conferred elsewhere, the analysis of the claim asserted in Count 4 of Plaintiff's *Complaint* necessarily begins by identifying the specific constitutional right which Defendants are alleged to have violated. See Graham v. Connor, 490 U.S. 386, 393-94 (1989); Reno v. Flores, 507 U.S. 292, 302 (1993). Alleged violations of a state law or the policies and procedures of a municipality or county cannot, standing alone, form the basis for a claim under 42 U.S.C. § 1983. See Jones v. City & County of Denver, 854 F.2d 1206, 1209 (10th Cir.1988). Thus, the Court limits its analysis to

Plaintiff's assertion that Defendants violated the First Amendment of the United States Constitution by retaliating against him for exercising his right to freedom of speech.

To evaluate Plaintiff's First Amendment retaliation claim, the Court employs a four-part balancing test for determining whether a public employer's actions impermissibly infringe on free speech rights of employees. See Pickering v. Bd. of Educ., 391 U.S. 563 (1968). Under this test, the Court first must decide whether the speech at issue touches on a matter of public concern. If it does, the Court must balance the interest of the employee in making the statement against the employer's interest in promoting the efficiency of the public services it performs through its employees. If these prerequisites are met, then the speech is protected, and the Court next considers whether the employee has shown that his expression was a motivating factor in the detrimental employment decision. Finally, even if the employee sustains this burden, the employer can still prevail if it shows by a preponderance of the evidence that it would have made the same decision regardless of the protected speech. See id. at 568; Schalk v. Gallemore, 906 F.2d 491, 494-95 (10th Cir.1990).

In this case, some of Plaintiff's remarks arguably satisfy the first and second elements of this test. "Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import." Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988); accord Burns, 330 F.3d at 1286-87. Plaintiff's complaints about illegal activity by other Detention Center employees may fall under this definition.

On the other hand, "speech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." David v. City and County of Denver, 101 F.3d 1344, 1355 (10th Cir.1996). In this regard, the Court "'will consider the motive of the speaker to learn if the speech was calculated to redress personal grievances [and therefore spoken as an employee] or to address a broader public purpose [and therefore spoken as a citizen].'" Id. (quoting Workman v. Jordan, 32 F.3d 475, 483 (10th Cir. 1994)). Applying this test, the Court concludes that Plaintiff's complaints about his working conditions and duty assignments, as well as his remarks specifically directed to the investigations and disciplinary actions which form the basis for his Title VII claims in this case, are not "protected speech" which may form grounds for a First Amendment claim against Defendants.

With respect to those statements which are protected, Plaintiff's First Amendment retaliation claim fails because the evidence he has presented does not support a reasonable inference that his protected speech was a motivating factor in any detrimental employment decisions. To prevail on this claim, Plaintiff must prove more than the mere fact that he criticized, reported, or complained about other Detention Center personnel before he was subjected to disciplinary action. See Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 685 (1996). Rather, he must show that his protected speech "was a substantial and motivating factor" in the decision to impose discipline. Id. at 675; accord Burns, 330 F.3d at 1287.

Plaintiff's testimony concerning the timing and context of his reports of illegal activities at the Detention Center is too vague to establish a nexus with the disciplinary

actions taken against him.  See Hullman v. Bd. of Trustees of Pratt Cmty. Coll., 950 F.2d

665, 668 (10th Cir. 1991).  Further, there is no evidence that Defendants Sisneros and

Tipton, who had the final decision-making authority with respect to Plaintiff's suspension

and termination, were the targets of Plaintiff's complaints about illegal activity.  While

Plaintiff may argue that Defendants should have taken greater care to scrutinize the motives

of some of the personnel under their command who played a subordinate role in processing

or investigating the inmate complaints, this argument is not enough to defeat Defendants'

summary-judgment motion.  Defendants' alleged "omissions and oversights amount at most

to simple negligence, which cannot form the basis for a First Amendment claim."  Wulf v.

City of Wichita, 883 F.2d 842, 863 (10th Cir. 1989).

Defendants also have presented evidence that the outcome of the inmate complaints

would not have changed if the Detention Center employees who were the targets of his

protected speech were further removed from the proceedings which led to his suspension and

termination.  See Schalk, 906 F.2d at 495.  Plaintiff has failed to present any evidence which

could support a reasonable inference to the contrary.  As noted above, the targets of

Plaintiff's protected speech were not the persons who initiated the complaints against him,

the incidents which formed the basis for those complaints were witnessed by several other

persons and/or captured on videotape, and those incidents were reviewed by an outside

investigator before Plaintiff was formally charged with any wrongdoing.  For all of the above

reasons, Defendants are entitled to summary judgment on the First Amendment retaliation

claim alleged in Count 4 of Plaintiff's *Complaint*.

**D.**     **Plaintiff's State-Law Claim for Breach of Contract**

Defendants assert that they also are entitled to summary judgment on breach-of-contract claim asserted in Count 3 of Plaintiff's *Complaint*.  This claim arises under state law and is before this Court only by virtue of the supplemental jurisdiction conferred by 28 U.S.C. § 1367(a).

"The district courts may decline to exercise supplemental jurisdiction over a claim under [28 U.S.C. § 1367](a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Having granted summary judgment on all of Plaintiff's claims arising under federal law, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim.  See 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).

In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction.  See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995).  The Court is not convinced that these factors weigh in favor of retaining jurisdiction.  In this regard, the Court notes that a parallel proceeding is already pending in state court, see Payton v. City of Albuquerque, No. D-0202-CV-0200307851 (N.M. 2nd Jud. Dist. Ct. filed Nov. 14, 2003), and that Plaintiff's breach of contract claim may involve "a novel or complex issue of State law."  28 U.S.C. § 1367(c)(1).  Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling reasons to the contrary.  See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990).  In

addition, the Court's decision not to exercise supplemental jurisdiction is not necessarily fatal to Plaintiff's state-law claim, as 28 U.S.C. § 1367(d) provides for the tolling of any limitations period regarding this claim.

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that Defendants are entitled to summary judgment on all of Plaintiff's claims arising under federal law (Counts 1, 2, and 4 of Plaintiff's *Complaint*), and that the state-law claim for breach of contract in Count 3 of Plaintiff's *Complaint* must be dismissed without prejudice because the Court declines to exercise supplemental jurisdiction over such state-law claims.

**IT IS, THEREFORE, ORDERED** that the *City Defendants' Motion for Summary Judgment Requesting Dismissal of All of Plaintiff's Claims* [Doc. No. 31] is **GRANTED IN PART** as to Counts 1, 2, and 4 of Plaintiff's *Complaint*, and **DENIED IN PART** as to Count 3 because the Court declines to exercise supplemental jurisdiction over that count.

**IT IS FURTHER ORDERED** that Counts 1, 2, and 4 of Plaintiff's *Complaint* are **DISMISSED WITH PREJUDICE** as to all Defendants.

**IT IS FURTHER ORDERED** that Count 3 of Plaintiff's *Complaint* is **DISMISSED WITHOUT PREJUDICE** based on the lack of supplemental jurisdiction.

**SO ORDERED**, this 27th day of May, 2004, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

-36-